ORAL ARGUMENT NOT YET SCHEDULED

No. 22-3062

# In the United States Court of Appeals for the District of Columbia Circuit

———————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

v.

THOMAS ROBERTSON,

*Defendant-Appellant*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
D. CT. NO. 1:21-CR-34 (COOPER, J.)

———————

APPELLEE'S BRIEF FOR THE UNITED STATES

———————

MATTHEW M. GRAVES
  United States Attorney
  District of Columbia

DENISE CHEUNG
CHRISELLEN KOLB
  Assistant U.S. Attorneys

KENNETH A. POLITE
  Assistant Attorney General

LISA H. MILLER
  Deputy Assistant Attorney
  General

JAMES I. PEARCE
  Special Assistant U.S. Attorney
  601 D Street, NW
  Washington, DC 20530
  (202) 532-4991
  James.Pearce@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), the undersigned certifies as follows:

### A.    Parties and Amici

The parties that appeared in the district court and that are now before this Court are the United States (appellee) and Thomas Robertson (defendant-appellant). There are no amici curiae or intervenors.

### B.    Rulings Under Review

Robertson seeks review of district court (Cooper, J.) orders (1) denying Robertson's motion for judgment of acquittal on a count that charged Robertson with obstructing a congressional proceeding, in violation of 18 U.S.C. § 1512(c)(2), App. 43-52; and (2) applying sentencing enhancements under (a) U.S.S.G. § 2J1.2(b)(1)(B) for an offense involving certain conduct intended to "obstruct the administration of the justice," and (b) U.S.S.G § 2J1.2(b)(2) for an offense that "resulted in substantial interference with the administration of justice," App. 68-71; *see also* SA 210-16.

## C.    Related Cases

This case has not previously been before this Court or any other court.    Other defendants convicted of obstructing a congressional proceeding in connection with the attack on the United States Capitol on January 6, 2021, have raised "substantially the same or similar issues," *see* D.C. Cir. R. 28(a)(1)(C), in the district court.    In a paragraph, Robertson raises the same issue currently pending in *United States v. Fischer et al.*, Nos. 22-3038, 22-3039, & 22-3041.    *See* Br.13.    Counsel is not aware of any other cases currently pending before this Court presenting issues "substantially the same" as or "similar" to those that Robertson raises here.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................... v

GLOSSARY OF ABBREVIATIONS ...................................................... xi

STATEMENT OF THE ISSUES .......................................................... 1

STATEMENT OF STATUTES AND REGULATIONS ........................... 1

STATEMENT OF THE CASE ............................................................. 1

    A.   Statement of facts ...................................................... 2

    B.   Statutory background and procedural history ........... 12

SUMMARY OF ARGUMENT............................................................... 18

ARGUMENT .................................................................................... 20

   I.   The evidence established that Robertson corruptly obstructed Congress's certification of the Electoral College vote ................................................................... 20

    A.   The district court correctly denied Robertson's acquittal motion........................................................ 21

       1.   The district court correctly defined "corruptly."........................................................22

       2.   The evidence sufficed to establish that Robertson acted corruptly for purposes of Section 1512(c)(2)................................................33

    B.   A defendant's dishonest intent to benefit himself or another is not necessary to prove that he acted corruptly.................................................................. 35

   II.   The district court did not plainly err by applying sentencing enhancements under Section 2J1.2.................. 39

A.    The certification of the Electoral College vote involved the "administration of justice" as defined broadly in the Guidelines............................................. 40

B.    Robertson's reliance on *United States v. Seefried* is misplaced................................................................. 51

CONCLUSION........................................................................................ 60

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Arthur Andersen LLP v. United States*,
    544 U.S. 696 (2005) .................................................... 22, 26-28, 32-33

*Bryan v. United States*,
    524 U.S. 184 (1998) ........................................................ 36

*Catrino v. United States*,
    176 F.2d 884 (9th Cir. 1949) ............................................ 32

*Cheek v. United States*,
    498 U.S. 192 (1991) ........................................................ 37

*DePierre v. United States*,
    564 U.S. 70 (2011) ......................................................... 57

*Elonis v. United States*,
    575 U.S. 723 (2015) ........................................................ 30

*Hughes v. United States*,
    138 S. Ct. 1765 (2018) ..................................................... 44

*In re Kendall*,
    712 F.3d 814 (3d Cir. 2013) ............................................... 42

*In re McConnell*,
    370 U.S. 230 (1962) ......................................................... 42

*Liu v. Lynch*,
    802 F.3d 69 (1st Cir. 2015) ................................................ 21

*Marinello v. United States*,
    138 S. Ct. 1101 (2018) ..................................................... 39

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
    551 U.S. 224 (2007) ........................................................ 49

*Rosner v. United States*,
  10 F.2d 675 (2d Cir. 1926) .................................................. 41

*Ry. Lab. Executives' Ass'n v. U.S. R.R. Ret. Bd.*,
  749 F.2d 856 (D.C. Cir. 1984) ............................................ 21

*Stinson v. United States*,
  508 U.S. 36 (1993) ............................................................ 47

*Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021) ............................................... 3

*United States v. Aguilar*,
  515 U.S. 593 (1995) ............................................... 33, 38, 42

*United States v. Ali*,
  864 F.3d 573 (7th Cir. 2017) .............................................. 49

*United States v. Amer*,
  110 F.3d 873 (2d Cir. 1997) ........................................... 47, 54

*United States v. Atlantic States Cast Iron Pipe Co.*,
  627 F. Supp. 2d 180 (D.N.J. 2009) ..................................... 49

*United States v. Bedoy*,
  827 F.3d 495 (5th Cir. 2016) .............................................. 29

*United States v. Booker*,
  543 U.S. 220 (2005) .......................................................... 44

*United States v. Caldwell*,
  581 F. Supp. 3d 1 (D.D.C. 2021) ....................................... 60

*United States v. Castleman*,
  572 U.S. 157 (2014) .......................................................... 43

*United States v. Delgado*,
  984 F.3d 435 (5th Cir. 2021) .............................................. 29

*United States v. Dorri,*
  15 F.3d 888 (9th Cir. 1994) ............................................................... 38

*United States v. Floyd,*
  740 F.3d 22 (1st Cir. 2014) ............................................................... 37

*United States v. Friske,*
  640 F.3d 1288 (11th Cir. 2011) ...................................................29, 31

*United States v. Gatling,*
  96 F.3d 1511 (D.C. Cir. 1996) ........................................................... 36

*United States v. Gordon,*
  710 F.3d 1124 (10th Cir. 2013) ......................................................... 29

*United States v. Harrington,*
  82 F.3d 83 (5th Cir. 1996) ................................................................. 56

*United States v. Hillie,*
  39 F.4th 674 (D.C. Cir. 2022) ........................................................... 21

*United States v. Hunter,*
  809 F.3d 677 (D.C. Cir. 2016) ........................................................... 40

*United States v. Jennings,*
  160 F.3d 1006 (4th Cir. 1998) ........................................................... 36

*United States v. Kelly,*
  147 F.3d 172 (2d Cir. 1998) .............................................................. 37

*United States v. Mann,*
  701 F.3d 274 (8th Cir. 2012) ............................................................ 29

*United States v. Matthews,*
  505 F.3d 698 (7th Cir. 2007) ............................................................ 30

*United States v. Mintmire,*
  507 F.3d 1273 (11th Cir. 2007) ......................................................... 29

*United States v. Nordean*,
  579 F. Supp. 3d 28 (D.D.C. 2021)..................................................... 59

*United States v. North*,
  910 F.2d 843 (D.C. Cir.), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990).........22-25, 27-28, 31, 38

*United States v. Partin*,
  552 F.2d 621 (5th Cir. 1977) ............................................................ 41

*United States v. Pasha*,
  797 F.3d 1122 (D.C. Cir. 2015).......................................................... 38

*United States v. Poindexter*,
  951 F.2d 369 (D.C. Cir. 1991).......................................................25, 38

*United States v. Popkin*,
  943 F.2d 1535 (11th Cir. 1991).......................................................... 37

*United States v. Reeves*,
  752 F.2d 995 (5th Cir. 1985) ............................................................ 37

*United States v. Reynoso*,
  38 F.4th 1083 (D.C. Cir. 2022) ......................................................... 21

*United States v. Robertson*,
  588 F. Supp. 3d 114 (D.D.C. 2022)..................................................... 60

*United States v. Sandlin*,
  575 F. Supp. 3d 16 (D.D.C. 2021)....................................................... 27

*United States v. Seefried*,
  No. 21-cr-287, --- F. Supp. 3d ---, 2022 WL 16528415 (D.D.C. Oct. 29, 2022)....................................................................20, 40, 51-58

*United States v. Suhl*,
  885 F.3d 1106 (8th Cir. 2018)............................................................ 36

*United States v. Watters*,
  717 F.3d 733 (9th Cir. 2013) ............................................................ 29

*United States v. Weissman*,
  22 F. Supp. 2d 187 (S.D.N.Y. 1998)...................................................... 49

*United States v. Winstead*,
  890 F.3d 1082 (D.C. Cir. 2018)...................................................... 53-54

*United States v. Young*,
  811 F.3d 592 (2d Cir. 2016).............................................................. 49

## Statutes and Constitutional Provisions

U.S. Const. amend. XII ............................................................... 2

U.S. Const. art. II, § 1 ................................................................. 2

U.S. Const. art. II, § 1, cl. 3................................................... 2, 50

3 U.S.C. § 15...................................................................... 2, 50, 59

3 U.S.C. § 16...................................................................... 50, 59

3 U.S.C. § 17...................................................................... 50

3 U.S.C. § 18...................................................................... 50

18 U.S.C. § 201................................................................... 36

18 U.S.C. § 551................................................................... 43

18 U.S.C. § 666................................................................... 36

18 U.S.C. § 922................................................................... 43

18 U.S.C. § 1503............................................................ 25, 42, 57

18 U.S.C. § 1505........................................................ 23, 25, 43, 58

18 U.S.C. § 1511................................................................. 43

18 U.S.C. § 1512.................................................... i, 1-2, 12, 18, 26, 42

18 U.S.C. § 1515 ..............................................................12, 26, 31, 43

18 U.S.C. § 1516 ........................................................................... 43

18 U.S.C. § 1519 ........................................................................... 43

18 U.S.C. § 1752 ............................................................................. 1

26 U.S.C. § 7212 ......................................................................37, 43

40 U.S.C. § 5104 ............................................................................. 2

False Statements Accountability Act of 1996, Pub. L. No. 104-292,
    110 Stat. 3459 ....................................................................... 26

Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 .......... 12

## Rules and Sentencing Guidelines

D.C. Cir. R. 28 ............................................................................i-ii

U.S.S.G. § 2J1.2 ......................................i, 1, 16-17, 19, 39-40, 42, 44-48

U.S.S.G. Appendix A ................................................................40, 42

## Other Authorities

Antonin Scalia & Bryan A Garner, *Reading Law: The
    Interpretation of Legal Texts* (2012) ................................................. 54

*Ballentine's Law Dictionary* (3d ed. 1969) ......................................38, 41

Black's Law Dictionary (11th ed. 2019) ...................................... 41, 51-52

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| App. | Appellant's Appendix |
| Br. | Appellant's Opening Brief |
| CDU | Civil Disturbance Unit |
| DE | Docket Entry |
| Ex. | Government Trial Exhibit |
| MPD | Metropolitan Police Department |
| MRE | Meal Ready to Eat |
| SA | Government's Supplemental Appendix |

## STATEMENT OF THE ISSUES

1. Whether the evidence, considered in the light most favorable to the jury's guilty verdict, established that Robertson corruptly obstructed the certification of the Electoral College vote on January 6, 2021, in violation of 18 U.S.C. § 1512(c)(2).

2. Whether the district court plainly erred in enhancing Robertson's sentence pursuant to U.S.S.G. § 2J1.2(b) because his criminal conduct obstructed the "administration of justice."

## STATEMENT OF STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum to Robertson's brief.

## STATEMENT OF THE CASE

A grand jury charged Robertson in a superseding indictment with obstruction of a congressional proceeding, in violation of 18 U.S.C. § 1512(c)(2); interfering with law enforcement officers during a civil disorder, in violation of 18 U.S.C. § 231(a)(3); entering and remaining in a restricted area while carrying a dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) & (b)(1)(A); disorderly conduct in a restricted area while carrying a dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) & (b)(1)(A); disorderly conduct in the Capitol building, in violation of 40

U.S.C. § 5104(e)(2)(D); and altering or destroying cell phones with the intent to render them unavailable for a grand jury investigation, in violation of 18 U.S.C. § 1512(c)(1). App.31-34. Following a jury trial, he was convicted on all counts. Robertson was sentenced to 87 months in prison, followed by three years of supervised release. App.60-61

## A.    Statement of facts

Under the Constitution, every four years, state-appointed "Electors," equal to the number of Senators and Representatives for that state, "vote by ballot" for the President and the Vice President of the United States. U.S. Const. art. II, § 1. After voting in their respective states, the electors sign, seal, and transmit their votes to the President of the Senate. *Id.* cl. 3; U.S. Const. amend. XII. Thereafter "[t]he President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted[; t]he Person having the greatest Number of Votes shall be the President." U.S. Const. art. II, § 1, cl. 3. Under the Electoral Count Act of 1887, that certification proceeding takes place at "1 o'clock in the afternoon" "on the sixth day of January" following a presidential election. 3 U.S.C. § 15.

As Congress was undertaking its constitutional and statutory obligation to certify the Electoral College vote on January 6, 2021, a mob of rioters forced their way past police officers and into the United States Capitol building, causing Members of Congress and the Vice President to flee. SA 76-81. The rioters threatened and assaulted officers, vandalized property, and flooded throughout the building. SA 140-43. The mob's violence "left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol." *Trump v. Thompson*, 20 F.4th 10, 15 (D.C. Cir. 2021). The mob's violent breach also forced the certification proceeding to stop, triggered a lockdown, and prevented Congress from resuming the certification for nearly six hours as police officers cleared the rioters from the Capitol.

Robertson was part of that mob. Robertson was a patrol sergeant in the Rocky Mount (Virginia) police department. SA 71, 105. He believed the November 2020 presidential election had been "rigged." SA 110. Four days after that election, for example, Robertson posted on Facebook a picture of then President-elect Biden appearing to wave at a cemetery with the caption, "Thanks for voting," implying that Biden was

"thanking dead people for voting in the election." SA 184. On the same

day, November 7, 2020, Robertson posted about four "boxes":[1]

> A legitimate republic stands on 4 boxes. The soapbox, the
> ballot box, the jury box, and then the cartridge box. We just
> moved to step 3. Step 4 will not be pretty. I cannot speak
> for others, but being disenfranchised by fraud is my hard
> line. I've spent most of my adult life fighting a counter
> insurgency. I'm about to become part of one, and a very
> effective one.

SA 188. Robertson expressed similar sentiments in a Facebook message

he posted on December 19, 2020:

> Civility has left me. Im tired of always taking the high road
> and being beat by those who cheat, lie, and steel to win and
> then allow their media to paint me as the bad guy. I won't be
> disenfranchised. I'll follow the path our founders gave us.
> Redress of grievances (already done) civil disobedience (here
> now) and then open armed rebellion. I've spent the last 10
> years fighting an insurgency in Iraq and then Afghanistan.
> Im prepared to start one here and know a bunch of like
> minded and trained individuals.

SA 189-90.

Robertson invited two men, his neighbor and a fellow police officer,

Jacob Fracker, to accompany him on a trip that Robertson planned to

D.C. on January 6, 2021. SA 113-14. Fracker served as a patrolman

---

[1] All quoted text from Robertson here and elsewhere in the brief is
reproduced verbatim without edits or corrections.

under Robertson's supervision and looked up to Robertson, whom he sometimes called "[d]ad," and who in turn referred to Fracker as "[s]on." SA 105-06.  Robertson made all the arrangements for the four-hour trip from Rocky Mount to D.C.: he packed cases of water and meals ready to eat, also known as MREs, which are "a quick way for . . . military members to eat while they're out in the field." SA 114-15.  Robertson also loaded into the car three gas masks and a large wooden stick; Fracker had never seen Robertson use a stick before.  SA 115-16.  Robertson and Fracker also brought guns with them, but they left those in the car at a Metro station in Virginia.  SA 118.

Upon arriving in D.C., Robertson, Fracker, and Robertson's neighbor headed to the Washington Monument, where they listened to speeches from former President Donald Trump, Rudy Giuliani, and others.  SA 119.  Shortly thereafter, the three men headed with a "big crowd" toward the Capitol building.  SA 120.  When they arrived at a plaza in front of the west side of the Capitol building, the "huge crowd" had gotten "pretty out of hand": there was "yelling, screaming, people . . . throwing things, flash bangs, [and] smoke grenades." SA 121.  All three men put on the gas masks that Robertson had packed.  SA 124-25.  Police

officers were "overwhelm[ed]" by rioters, SA 121, and "severely outnumbered," SA 67. It was evident to Fracker as a police officer that the situation was not safe for the greatly overmatched law enforcement officers. SA 123. Officers from the United States Capitol Police were "doing their best to try to push the crowd back." SA 70.

Officers from the Metropolitan Police Department ("MPD") also responded to the Capitol. One MPD group sent to the scene was CDU-42, a civil disturbance unit. SA 73-74. The CDU-42 platoon leader fielded a call over the police radio asking the unit to "harden up" by deploying extra gear such as padding and to deploy to the Capitol. SA 75-76. After being dropped on the outskirts of the Capitol grounds, thirty CDU-42 officers walked in two single-file lines toward the Capitol building, passing through rioters holding "large sticks" and "throwing cement," SA 93-95, while also berating the CDU-42 officers as "traitors" and "oath breakers," SA 84, 98. In one officer's view, the crowd appeared "a hundred times the size of us." SA 95.

As the CDU-42 officers approached the Capitol building, they encountered Robertson. Girded with a gas mask, Robertson stood

directly in front of the advancing line of CDU-42 officers holding his large wooden stick in the "[p]ort arms" position:

 

SA 103; Ex.201C (image of Robertson from body-worn camera of CDU-42 officer, above left); Ex.201D (same, above right). "Port arms" is a "tactical position" in which a baton or stick may be used "both offensively and defensively." SA 85. Law enforcement officers typically assume the port-arms position when they are "going to do a lot of pushing." SA 102. Among the throng of rioters on January 6, Robertson stood out to MPD Officer Noah Duckett because he observed Robertson use his wooden stick to strike a fellow officer before Robertson took a "swipe[]" at Duckett too. SA 103.

Shortly thereafter, Robertson and Fracker moved past scaffolding that had been erected on the west front of the Capitol for the upcoming presidential inauguration. SA 130-31. A group in front of them had breached the scaffolding, and Robertson and Fracker "followed suit,"

pushing up stairs and into a courtyard just outside the Capitol building. SA 131-32. As the two men approached the building, Fracker and Robertson engaged in "drag race" to enter the building. SA 179. Fracker entered the Capitol building first, where he witnessed a chaotic scene: broken glass, overturned furniture, people streaming in through the windows, and an alarm blaring. SA 142. Fracker felt "hyped up" with "[a]drenaline flowing," hopeful that his actions would lead Congress to "[o]verturn the election results." SA 142-43.

Two minutes later, SA 195, Robertson also breached the Capitol, where he rejoined Fracker. SA 145-47. The two men embraced, SA 152, and then began taking pictures in the Capitol Crypt where the sound from the accumulated rioters was "[d]eafening." SA 154. The two posed for a selfie in front of a statue, with Fracker holding up his middle finger and Robertson clutching the large wooden stick:



SA 154-55; Ex.103 (above).

As an overwhelmed police line observed them from across the room, more rioters flooded into the area where Robertson and Fracker stood. SA 153-55. As the throng began chanting, Robertson banged his wooden stick along with the beat. SA 158. Celebrating this moment in a Facebook post after January 6, Robertson told a friend, "We were stomping on the roof of their safe room chanting WHOS HOUSE? OUR HOUSE." SA 186. Eventually police officers were able to regain control of the area, directing Robertson and Fracker to leave, which they did after having remained in the Crypt for approximately ten minutes. SA 158-62, 183.

Robertson continued to glorify his actions in the days after January 6. One day later, Robertson wrote to a correspondent through

an online account at the website AR-15.com that pictures of members of Congress "huddled in the floor crying is the most American thing I have ever seen" because those members "now understand who they truly are accountable to in the end." SA 190-93. And on January 9, Robertson posted a comment on Facebook along with the picture of him and Fracker inside the Capitol building:

> Here's the picture in question and I am fucking PROUD of it. It shows 2 men willing to actually put skin in the game and stand up for their rights. If you are too much of a coward to risk arrest, being fired, and actual gunfire to secure your rights, you have no words to speak I value. Enjoy your feel good protests and fame. I'll simply accept a "Thank you" for the very blanket of freedom that you live and sleep under.

SA 180-81. Robertson also suggested that "CNN and the Left" were "mad" because "we actually attacked the government" and "took the fucking U.S. Capitol." SA 184-85. Using his AR-15.com account, Robertson posted a screenshot from a Department of Justice website listing him as a charged defendant in connection with the events of January 6 and boasted that he "sure as fuck" was proud to be prosecuted for participating in the attack on the Capitol. SA 193-94.

Despite that apparent pride in being prosecuted, Robertson took steps to obstruct the ensuing criminal investigation. After authorities

10

contacted both Robertson and Fracker to turn themselves in, Robertson asked Fracker for Fracker's phone; Fracker understood that Robertson would "make it disappear" to get rid of incriminating evidence.  SA 169-70.  When Robertson was arrested on January 13, 2021, he did not have a cellphone with him.  SA 86-87.  A search of his home six days later uncovered a phone from a workbench in an outbuilding that had been activated on January 14, 2021, the day after his arrest.  SA 87-91.  In a text message exchange the following day, January 15, Robertson told a correspondent that "[a]nything that may have been problematic is destroyed."  SA 196.  When asked in the exchange whether authorities had conducted a search and "seize[d]" his phone, Robertson replied that federal agents "asked for my phone but I'm not a retard."  SA 197-99.  Specifically, Robertson indicated that his prior cell phone "[t]ook a lake swim" and "later had a tragic boating accident."  SA 198-200.  Authorities also recovered the large wooden stick that Robertson had carried with him to the Capitol; when questioned, Robertson said it was a flagpole he had used to carry a flag.  SA 92.

### B.     Statutory background and procedural history

1. Congress enacted a prohibition on "Tampering with a record or otherwise impeding an official proceeding" in Section 1102 of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, 807, and codified it in Chapter 73 (Obstruction of Justice) as subsection (c) of the pre-existing Section 1512. That prohibition applies to

> (c) [w]hoever corruptly--
>> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.

18 U.S.C. § 1512(c). Another provision defines "official proceeding" to include a "proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B).

2. Before trial, Robertson moved to dismiss the indictment on various grounds. SA 1. As relevant here, Robertson argued that Section 1512(c)(2) was unconstitutionally vague in part because the term "corruptly" enabled "vague and arbitrary . . . enforcement" of the statute. SA 11. In denying Robertson's dismissal motion, the district court reasoned that "corruptly" was not constitutionally vague and that the

government would "at least have to show . . . conscious[ness] of wrongdoing." SA 26.

The parties also submitted proposed jury instructions before trial. Robertson proposed that to act "corruptly," a defendant "must use unlawful means or have a wrongful or unlawful purpose, or both. An act is done 'corruptly' if the defendant acted knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice." SA 35. Robertson further proposed instructing the jury that a defendant "must also act with 'consciousness of wrongdoing,'" defined as acting "with an understanding or awareness that what the person is doing is wrong or unlawful." *Id.*[2]

The district court's final jury instructions defined "corruptly" for purposes of Section 1512(c)(2) as follows:

> To act corruptly the defendant must use unlawful means, or act with an unlawful purpose, or both. The defendant must also act with consciousness of wrongdoing. Consciousness of wrongdoing means with an understanding or awareness that what the person is doing is wrong.

---

[2] Robertson also proposed a paragraph providing contrasting examples of what would and would not qualify as acting "corruptly." *See* SA 35. As noted in the next paragraph of the main text, the district court included that paragraph in the jury instructions.

Not all attempts to obstruct or impede an official proceeding involve acting corruptly. For example, a witness in a court proceeding may refuse to testify by invoking his constitutional privilege against self-incrimination, thereby obstructing or impeding the proceeding. But he does not act corruptly. In contrast, an individual who obstructs or impedes a court proceeding by bribing a witness to refuse to testify in that proceeding or by engaging in other independently unlawful conduct does act corruptly.

SA 203.

The jury convicted Robertson on all counts.

3. Robertson moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. App.35-41. He "adopt[ed] and incorporate[d]" the arguments in his motion to dismiss the Section 1512(c)(2) count, App.37, and argued for the first time that "corruptly" in Section 1512(c)(2) required proof that the defendant "acted knowingly and dishonestly *with the intent to obtain an unlawful advantage for himself or an associate, and that he influenced another to violate their legal duty.*" App.38 (emphasis added). Turning to the evidence, Robertson contended that he "did not break or take anything" and the only evidence adduced by the government to demonstrate that he acted corruptly was his "mere presence" in the Capitol building. App.39.

The district court denied Robertson's acquittal motion. App.43-57. It reasoned that, to the extent Robertson had renewed his vagueness challenge to "corruptly," that challenge failed because Section 1512(c)(2) was "properly narrowed" through the requirement that the government prove "'consciousness of wrongdoing.'" App.46. The district court next concluded that the evidence "comfortably support[ed] the jury's verdict." App.49. Evidence that Robertson acted corruptly included his statements and actions showing that he intended "to use violence on January 6th, which in turn [was] indicative of using unlawful means or acting with unlawful purpose." App.51. Moreover, Robertson impeded law enforcement officers outside the Capitol building; joined "the first wave of people who made their way to the Upper West Terrace to enter the Capitol building"; unlawfully trespassed into the Capitol building as part of a group that "well outnumbered police"; carried a large wooden stick, a dangerous weapon, on both Capitol grounds and into the building; engaged in disorderly conduct while inside the building by banging his stick along with the crowd's chants; and left only when directed by police to do so. App.51-52.

4. The case proceeded to sentencing. The probation office prepared a Presentence Investigation Report that, as relevant here, proposed applying two enhancements under U.S.S.G. § 2J1.2 (obstruction of justice). First, it recommended applying Section 2J1.2(b)(1)(B), which provides an eight-level enhancement where "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." DE 122 (Presentence Investigation Report) ¶ 58. Second, it recommended applying Section 2J1.2(b)(2), which provides a three-level enhancement where "the offense resulted in substantial interference with the administration of justice." *Id.* ¶ 59.

In his sentencing memorandum and at the sentencing hearing, Robertson argued that those enhancements were factually inapplicable. *See* SA 54-55, 205. For example, Robertson contended that he did not use his wooden stick to "cause physical injury to a person or create[] any property damage," SA 205, because holding the stick in the port-arms position did not qualify as "using it in a threatening manner," SA 207; *see also* SA 55 (same). He contended that the three-level enhancement for substantial interference did not apply because the enhancement was

intended to address significant costs that accrue "after the actual obstruction occurs, not necessarily before." SA 214; SA 55 (arguing that Robertson "did nothing that increased the resources" that the government expended). Robertson did not argue that the two enhancements were inapplicable because the certification proceeding did not constitute the "administration of justice" for purposes of Section 2J1.2.

The district court rejected Robertson's factual challenges. With respect to the enhancement under Section 2J1.2(b)(1)(B), the court reasoned that Robertson engaged in "threatening or menacing conduct" by standing directly in front of a line of police officers while wearing a gas mask and a backpack, holding a stick in port-arms position, refusing to move, and making contact with the officers as they were trying "to organize a line to fight off a violent mob." SA 211. The district court applied the enhancement under Section 2J1.2(b)(2) because Robertson's offense resulted in substantial interference in light of "the delay that the riot caused in the certification proceeding" and "the expenditure of substantial resources that was necessary to fix the damage that was done to the Capitol." App.71-72.

17

## SUMMARY OF ARGUMENT

I. Robertson cannot show that no reasonable jury would have convicted him of violating 18 U.S.C. § 1512(c)(2). The district court correctly concluded that the evidence "comfortably" established that Robertson through his words and actions acted "corruptly" by using unlawful means and acting with an unlawful purpose, while also evincing "'consciousness of wrongdoing.'" App.51-52. The district court's definition of "corruptly" in 18 U.S.C. § 1512(c)(2) was consistent with decisions from this Court and the Supreme Court and ensured that Robertson was not convicted based on innocent or innocuous conduct.

Indeed, the evidence of Roberson's conduct leading up to and on January 6 amply sufficed to demonstrate that he acted "corruptly": Robertson, a police officer, advocated using violence and his own military training to start a counterinsurgency; came to the Capitol on January 6 with a gas mask and large wooden stick; menacingly impeded police officers responding to the Capitol, using his stick against two of them; breached the Capitol among the first group of rioters; engaged in disorderly chanting designed, as he later bragged, to intimidate the

lawmakers trapped inside; and remained in the Capitol building until ordered out by police officers.

Although the "corruptly" definition that Robertson offered after trial—that it requires a dishonest intent to benefit oneself or others— would be *sufficient* to prove that a defendant acted corruptly, no authority from this Court or elsewhere has held that it is *necessary* to prove corrupt intent for purposes of congressional or judicial obstruction.

II.  The district court did not plainly err in applying to Robertson's Section 1512(c)(2) conviction two sentencing enhancements under U.S.S.G. § 2J1.2 based on conduct that "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," § 2J1.2(b)(1)(B), and that "resulted in substantial interference with the administration of justice," § 2J1.2(b)(2).  The district court correctly applied both enhancements because Section 2J1.2's text, purpose, and commentary all support the conclusion that conduct that obstructs Congress's certification of the Electoral College vote interferes with the "administration of justice" for purposes of the guideline.  Robertson's heavy reliance on *United States v. Seefried*, No. 21-cr-287, --- F. Supp. 3d ---, 2022 WL 16528415 (D.D.C.

Oct. 29, 2022) (McFadden, J.), is misplaced because *Seefried* misreads Section 2J1.2's text and commentary, places undue emphasis on a corpus linguistics analysis, and creates unwieldy line-drawing problems.

## ARGUMENT

### I.   The evidence established that Robertson corruptly obstructed Congress's certification of the Electoral College vote.

Robertson contends (Br. 12-21) that the government presented insufficient evidence to establish that he corruptly obstructed the proceeding to certify the Electoral College vote on January 6, 2021, because it failed to prove that he had a "dishonest intent to benefit himself or another." *Id.* at 12. Robertson proposed that definition of "corruptly" for the first time in his post-trial acquittal motion; at trial, he requested—and received—an instruction defining "corruptly" as "us[ing] unlawful means, or act[ing] with an unlawful purpose, or both[,]" and acting "with consciousness of wrongdoing." SA 203; *see* SA 35 (Robertson proposed jury instructions). That instruction was correct, and the government amply proved Robertson's guilt under that standard. [3]

---

[3] In a single paragraph, Robertson asks to "benefit" from any ruling in *United States v. Fischer et al.*, Nos. 22-3038, 22-3039, & 22-3041 (D.C. Cir.) (argued Dec. 12, 2022), that narrows Section 1512(c)(2). That cursory mention is insufficient to preserve the issue in this case. *See Ry.*

For a sufficiency challenge, this Court's review is "highly deferential to the jury's decision" and assesses the evidence in the light most favorable to that verdict to determine whether "*any* rational trier of fact" that had been properly instructed on the elements of the offense could have found those elements beyond a reasonable doubt. *United States v. Reynoso*, 38 F.4th 1083, 1089 (D.C. Cir. 2022) (internal quotation marks omitted); *see United States v. Hillie*, 39 F.4th 674, 679-80 (D.C. Cir. 2022).

## A. The district court correctly denied Robertson's acquittal motion.

Defining "corruptly" consistently with instructions proposed by both parties, *see* SA 31, 35, the district court instructed the jury that to act "corruptly" for purposes of Section 1512(c)(2), a defendant "must use unlawful means, or act with an unlawful purpose, or both," and must act

---

*Lab. Executives' Ass'n v. U.S. R.R. Ret. Bd.*, 749 F.2d 856, 859 n.6 (D.C. Cir. 1984) (treating as waived an argument that included "no discussion of the relevant statutory text, legislative history, or relevant case law"); *see also Liu v. Lynch*, 802 F.3d 69, 75 (1st Cir. 2015) (reiterating the "well settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived") (internal quotation marks omitted). In any event, Robertson's claim lacks merit for the reasons given in the government's briefing in *Fischer*.

with "consciousness of wrongdoing," which "means with an understanding or awareness that what the person is doing is wrong." SA 203. That instruction ensured that Robertson could not be convicted unless his conduct was "inherently malign." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703-04 (2005). The instruction Robertson requested and that the district court gave was correct, and the evidence introduced at trial amply established that Robertson acted corruptly in obstructing the certification of the Electoral College vote.

### 1.    The district court correctly defined "corruptly."

To violate Section 1512(c)(2), a defendant must act "corruptly." Because that term is not statutorily defined, it is "understood . . . to have its usual meaning." *United States v. North*, 910 F.2d 843, 881 (D.C. Cir.) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam). As a matter of plain language, "corruptly" is "normally associated with wrongful, immoral, depraved, or evil." *Arthur Andersen*, 544 U.S. at 705; *see North*, 910 F.2d at 881 ("corruptly" means "depraved, evil: perverted into a state of moral weakness or wickedness") (internal quotation marks omitted). The district court's definition of "corruptly" for purposes of Section 1512(c)(2)

properly accounted for the term's meaning in the context of congressional obstruction.

a.   In *North*, the defendant, who was prosecuted under 18 U.S.C. § 1505[4] for obstructing Congress, argued that he was entitled to a jury instruction that he acted under the good-faith belief that his conduct was authorized.  910 F.2d at 878.  In rejecting that argument, this Court upheld the district court's instructions because they defined the "required intent" even though they did not define "corruptly," which could be understood according to its "common meaning[]." *Id.* at 884.   In discussing the term, however, the Court disagreed with the view that "corruptly" "means nothing more than an intent to obstruct." *Id.* at 882. Although such a presumption may be appropriate for judicial proceedings, where "very few non-corrupt ways to or reasons for intentional obstructing . . . leap immediately to mind," it "would undoubtedly criminalize some innocent behavior" if applied in the congressional context. *Id.*; *see also id.* (noting that an "executive branch

---

[4] Section 1505 applies to "[w]hoever corruptly . . . influences, obstructs, or impedes or endeavors to influence, obstruct, or impede . . . the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress." 18 U.S.C. § 1505.

official" or a "political activist" may seek to persuade a representative to "stop[] spending her time pursuing a certain investigation" but instead pursue "some other legislative endeavor"; that conduct could be viewed as "endeavoring to impede or obstruct the investigation, but it is not necessarily doing so corruptly").

Judge Silberman developed that point further in a separate opinion in *North*, ultimately offering an interpretation of "corruptly" that the majority did not. Focused on the verb "influence," which appears in both Section 1505 and Section 1512(c)(2), he noted that if "corruptly" meant only to act with the intent to influence, "we might as well convert all of Washington's office buildings into prisons." 910 F.2d at 942 (Silberman, J., concurring in part and dissenting in part). In Judge Silberman's view, a person acting corruptly "might mean (1) that he does so with a corrupt purpose, or (2) that he does so by independently corrupt means, or (3) both." *Id.* at 942-43. The independently corrupt means route would enable a jury to avoid "prob[ing] the morality or propriety of the defendant's purpose" because someone who, for example, bribes a Member of Congress "can be said to have acted 'corruptly' no matter how laudable his underlying motive." *Id.* at 943. A corrupt purpose theory,

24

in his view, would be limited to determining "whether the defendant was attempting to secure some advantage for himself or for others that was improper or not in accordance with the legal rights and duties of himself or others." *Id.* at 944.

The year following *North*, this Court suggested in *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), that "corruptly" as used in Section 1505 was "vague . . . in the absence of some narrowing gloss." *Id.* at 378. After surveying the obstruction statute's legislative history, including the "[o]rigins" of 18 U.S.C. §§ 1503 and 1505 and case law interpreting Section 1505, the Court reversed the defendant's conviction because Section 1505 failed to provide "constitutionally required notice" that the defendant's conduct—making false and misleading statements to Congress—fell within the statute's scope. *Id.* at 380, 386. The Court disclaimed any conclusion that "'corruptly'" in Section 1505 was "unconstitutionally vague as applied to all conduct," *id.* at 385, and also declined to adopt as a standard that "'corruptly' means that in acting, the defendant aimed to obtain an 'improper advantage for [himself] or someone else inconsistent with official duty and rights of others,'" *id.* at 385-86 (quoting *North*, 910 F.2d at 881-82).

Five years after *Poindexter*, Congress defined "corruptly" for purposes of Section 1505.  *See* False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459 (codified at 18 U.S.C. § 1515(b)).  Like Judge Silberman's proposed interpretation in *North*, Section 1515(b) defines "corruptly" by reference either to a defendant's purpose or conduct: "the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information."  Enacted in 1996, Section 1515(b)'s definition of "corruptly" for purposes of congressional obstruction in Section 1505 does not apply to Section 1512(c)(2), which Congress passed in 2002. *See supra* at 12.

In *Arthur Andersen*, the Supreme Court interpreted the phrase "knowingly . . . corruptly persuades" in 18 U.S.C. § 1512(b),[5] to require proof that a defendant acted not only with intent to obstruct but also with "consciousness of wrongdoing."  544 U.S. at 706.  The Court determined

---

[5] Section 1512(b) applies to "[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to" take or not take certain actions.

that the jury instructions in that case were erroneous because they did not require the jury to find "any type of 'dishonesty,'" allowed conviction where a defendant "simply 'impeded' the Government's factfinding ability," and thus risked ensnaring "innocent conduct." *Id.* at 706-07 (brackets omitted). By contrast, the Court explained, a "consciousness of wrongdoing" standard would ensure that only those who understand the character and import of their actions are punished. *See id.* at 706.

b. The district court's definition of "corruptly" in the jury instructions properly synthesized considerations identified in *North*, *Poindexter*, and *Arthur Andersen*. Acknowledging that "the plain meaning of 'corruptly' encompasses both corrupt (improper) *means* and corrupt (morally debased) *purposes*," *United States v. Sandlin*, 575 F. Supp. 3d 16, 31 (D.D.C. 2021), the district court's instructions required the government to prove that Robertson either "use[d] unlawful means" or "act[ed] with an unlawful purpose." SA 203; *see North*, 910 F.2d at 942-43 (Silberman, J., concurring in part and dissenting in part). And drawing from *Arthur Andersen*, *see* 544 U.S. at 706, the instructions also required proof that Robertson acted with "consciousness of wrongdoing," which the district court further defined as acting "with an understanding

27

or awareness that what the person is doing is wrong." SA 203.

The district court also included a paragraph (*see supra* at 13) in the jury instructions that further "convey[ed] the requisite consciousness of wrongdoing." *Arthur Andersen*, 544 U.S. at 706. That paragraph explained that a person who acts intentionally to influence or impede a congressional proceeding has not violated the obstruction statute unless that person acts corruptly such as by engaging in bribery or "other independently unlawful conduct." SA 203. The paragraph thus both clarified that intent to obstruct the proceeding in question is not, at least in the context of congressional obstruction, sufficient to prove that a defendant acted "corruptly," *see North*, 910 F.2d at 882,[6] and underscored that a person can act corruptly for purposes of Section 1512(c)(2) if he employed "independently corrupt means," *id.* at 942-43 (Silberman, J., concurring in part and dissenting in part).

The district court's definition of "corruptly" also was consistent with—indeed, more demanding than—definitions of "corruptly" applied

---

[6] The instructions additionally required the government to prove that Robertson "acted with the intent to obstruct or impede the official proceeding." SA 202. Robertson does not challenge that instruction or the evidence establishing his intent to obstruct.

to Section 1512(c)(2) by other courts of appeals. Since the statute's enactment in 2002, courts have interpreted "corruptly" in Section 1512(c)(2) to require intent to obstruct and some degree of wrongfulness. *See United States v. Delgado*, 984 F.3d 435, 452 (5th Cir. 2021) (to act "corruptly" means to act "knowingly and dishonestly, with specific intent to subvert or undermine the due administration of justice") (internal quotation marks omitted); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing") (internal quotation marks omitted); *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (to act "corruptly" is to act "with an improper purpose" and "to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct") (quoting *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007)); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Mann*, 701 F.3d 274, 307 (8th Cir. 2012) (same). Courts interpreting the neighboring provision, Section 1512(c)(1), have reached similar conclusions. *See United States v. Bedoy*, 827 F.3d 495, 510 (5th Cir. 2016) (a "proper definition" of "corruptly" for purposes of Section 1512(c)(1) is to act "knowingly and dishonestly, with the specific

intent to subvert or undermine the due administration of justice")
(internal quotation marks omitted); *United States v. Matthews*, 505 F.3d
698, 705 (7th Cir. 2007) (upholding instruction defining "[c]orruptly" in
Section 1512(c)(1) as acting "with the purpose of wrongfully impeding the
due administration of justice").

c.  Robertson's attacks on the "corruptly" jury instruction given by
the district court—an instruction materially identical to the one he
requested—lack merit.[7]  First, he contends (Br.14-16) that the definition
is "too broad" because it could sweep in criminal and non-criminal
conduct.  *Id.* at 14; *see also id.* at 18 (arguing that the phrase
consciousness of wrongdoing "extends too readily to non-criminal
activity").  Robertson misapprehends the function of the *mens rea*
requirement.  In *Elonis v. United States*, 575 U.S. 723, 736-37 (2015), the
Supreme Court explained that the criminal law requires only the *mens
rea* necessary to separate "wrongful" from "otherwise innocent" conduct
(internal quotation marks omitted).  Because criminal liability turns on
general notions of culpability and wrongful conduct, which may (but need

---

[7] Section I.B *infra* addresses the "corruptly" instruction that Robertson
proposed for the first time *after* his trial conviction.

not) involve the violation of another criminal statute, Robertson's complaint falls flat.

In fact, the instructions' requirement that Robertson have acted with an "unlawful" purpose is more demanding than the "improper purpose" required to prove corrupt congressional obstruction under Section 1505. *See* 18 U.S.C. § 1515(b); *see also Friske*, 640 F.3d at 1291 (defining "corruptly" in Section 1512(c)(2) as "improper purpose") (internal quotation marks omitted). Moreover, the instructions, read as a whole, implied that, at least as far as the means theory, the defendant's conduct must be "independently criminal." *See North*, 910 F.2d at 943 (Silberman, J., concurring in part and dissenting in part). For example, the instructions described a person who sought to obstruct by "bribing a witness" or "engaging in other independently unlawful conduct." SA 203.

After arguing that the instruction was flawed because it could be read to permit conviction in the absence of other criminal conduct, Robertson next faults (Br.16-17) the district court's instruction for improperly *requiring* proof of other criminal conduct, namely, a "predicate" criminal offense. That argument is mistaken, however, because the district court's instructions neither "listed" any "predicates"

31

nor suggested that the commission of another crime could "trigger criminal liability" under Section 1512(c)(2). Br.17. Instead, the instructions made clear that the government had to prove that Robertson "attempted or did obstruct or impede an official proceeding," SA 202, and that if in carrying out that actual or completed obstruction, he used unlawful means or acted with an unlawful purpose, the jury could (as it did) conclude that he had acted "corruptly." SA 203. Congress need not limit what qualifies as "corrupt" conduct through "an express statutory cross-reference," Br.17, given "the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined." *Catrino v. United States*, 176 F.2d 884, 887 (9th Cir. 1949).

Finally, although Robertson urged the district court to require proof that that he acted with "'consciousness of wrongdoing,'" SA 35, he now argues (Br.18-20) that including that phrase was "inapt." *Id.* at 18. As in *Arthur Andersen*, however, requiring proof of consciousness of wrongdoing limited Section 1512(c)(2)'s "reach" only to an individual "with the level of 'culpability . . . we usually require in order to impose criminal liability.'" 544 U.S. at 706 (quoting *United States v. Aguilar,*

515 U.S. 593, 602 (1995)).  And even though the jury instructions here,
like those in *Arthur Andersen*, did not include the term "dishonestly,"
they "convey[ed] the requisite consciousness of wrongdoing," *id.*, by using
that very phrase alongside the rest of the district court's definition of
"corruptly."

> ### 2. The evidence sufficed to establish that Robertson acted corruptly for purposes of Section 1512(c)(2).

Measured in the light most favorable to the jury's verdict, the
evidence established that Robertson intentionally and corruptly
obstructed the Electoral College vote certification proceeding.  From
shortly after the November 2020 presidential election, Robertson evinced
his intent not only to stop the transfer of presidential power, but to do so
using violence—including the "cartridge box"—and his military training
to fight as a "counter insurgency."  SA 188-90.  He organized a trip to
Washington, D.C., for himself and others, including a fellow police officer
whom he supervised, Jacob Fracker.  Robertson packed gas masks,
MREs, a gun, and a large wooden stick.  Leaving the gun behind in his
car, he marched from the Ellipse to the Capitol building, where a large
crowd that vastly outnumbered police officers was assembling.

Donning his gas mask in the midst of the chaos on the west front of

the Capitol building, Robertson stood directly in front of an MPD civil disturbance unit as it responded to the scene; he held his large wooden stick in port-arms position indicating he was ready to push. As the MPD officers neared, Robertson, himself a police officer, did not yield but instead used his wooden stick to strike one officer and take a "swipe" at another. Robertson then raced inside the Capitol building—which was already a chaotic scene with broken glass, overturned furniture, and alarms blaring—as part of the first group to force their way inside. After briefly separating from Fracker, Robertson rejoined him in the Capitol Crypt where both began chanting and Robertson banged his stick in time with the crowd. In Robertson's words, he was "stomping on the roof of [the members of Congress's] safe room chanting WHOS HOUSE? OUR HOUSE." SA 186. Robertson and Fracker left only after police regained control of the Crypt and ordered them out. The evidence thus overwhelmingly demonstrated that Robertson acted corruptly, including through his intention "to use violence on January 6th, which in turn [was] indicative of using unlawful means or acting with unlawful purpose." App.51.

Robertson's sole response is to minimize the conduct in which he

34

engaged. For one thing, his sufficiency argument entirely ignores his conduct outside the Capitol where he impeded MPD officers. He suggests (Br.17) that he did nothing other than enter "an area to which the public has access," overlooking the fact that the Capitol building was entirely closed to the public that day and that Robertson, as one of the "first wave" of rioters, App.52, enabled those who followed him to penetrate more deeply into the breached building. Robertson emphasizes (Br.21) that Fracker later wrote on Facebook, "Not like I did anything illegal," but Fracker acknowledged at trial that, when he wrote that message, he well knew he had engaged in unlawful conduct and was simply indulging a "false sense of security." SA 176-77. Assessed under the proper standard, the evidence was amply sufficient to prove that Robertson acted corruptly for purposes of Section 1512(c)(2).

### B.     A defendant's dishonest intent to benefit himself or another is not necessary to prove that he acted corruptly.

Robertson principally argues (Br.12-21) that the jury instructions (materially identical to those which he himself proposed) were erroneous and the evidence therefore was insufficient to prove he acted dishonestly with the intent to benefit himself or another. The district court did not err by failing to define "corruptly" in the manner Robertson now

advocates because, although conduct fitting that definition would be *sufficient* to prove the *mens rea* in Section 1512(c)(2), it is not *necessary* to do so.

Like "willfully," "corruptly" may fairly be described as "'a word of many meanings' whose construction is often dependent on the context in which it appears." *Bryan v. United States*, 524 U.S. 184, 191 (1998). For example, "corruptly" as used in the obstruction-of-justice statutes generally differs from the use of that term in bribery statutes such as 18 U.S.C. § 201 and 18 U.S.C. § 666. "Given the equation of bribery with a *quid pro quo,* 'corruptly' in the context of the bribery statute would appear to mean that the defendant accepts money with the specific intent of performing an official act in return." *United States v. Gatling*, 96 F.3d 1511, 1522 (D.C. Cir. 1996) (addressing conspiracy to violate Section 201); *see United States v. Suhl*, 885 F.3d 1106, 1114 n.5 (8th Cir. 2018) (upholding jury instruction in Section 666 case that defined "corruptly" as acting "with the intent that something of value be given or offered to influence an agent of the state in connection with the agent's official duties") (quoting *United States v. Jennings*, 160 F.3d 1006, 1019 (4th Cir. 1998)).

The dishonesty and improper-benefit standard that Robertson proposes is not required under Section 1512(c). That standard is most frequently used in the context of certain fraud and tax offenses. For example, courts have adopted that interpretation when interpreting "corruptly" as used in 26 U.S.C. § 7212(a), which prohibits "corruptly . . . imped[ing]" federal tax law. *See United States v. Floyd*, 740 F.3d 22, 31 (1st Cir. 2014) (noting a "consensus among the courts of appeals that 'corruptly'" in Section 7212(a) "means acting with an intent to procure an unlawful benefit either for the actor or for some other person," and citing cases); *see also United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (adopting that interpretation of "corruptly" in Section 7212(a)); *United States v. Popkin*, 943 F.2d 1535, 1540 (11th Cir. 1991) (same); *United States v. Reeves*, 752 F.2d 995, 1001 (5th Cir. 1985) (same). The federal courts' uniform adoption of a more specific and rigorous definition of "corruptly" in Section 7212(a) accords with other *mens rea* requirements in the criminal tax context. *See Cheek v. United States*, 498 U.S. 192, 199-201 (1991) (holding that—unlike in other criminal contexts—the term "willfully" in the tax code requires proof "that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he

37

voluntarily and intentionally violated that duty," because "the complexity of the tax laws" may make it "difficult for the average citizen to know and comprehend the extent of the[ir] duties and obligations" under those laws). But no court interpreting Section 1512(c) appears to have interpreted "corruptly" in that manner.

Although not required, Robertson's proposed improper-benefit theory would be *sufficient* to establish that a defendant acted "corruptly" for purposes of Section 1512(c)(2). In *North*, this Court observed that "[a] 'corrupt' intent *may* also be defined as 'the intent to obtain an improper advantage for [him]self or someone else, inconsistent with official duty and the rights of others.'" 910 F.2d at 881-82 (emphasis added) (citing *Ballentine's Law Dictionary* 276 (3d ed. 1969)); *see also Poindexter*, 951 F.2d 385-86 (describing that interpretation as "narrower" than others but not holding that it is a "necessary element" to prove congressional obstruction under Section 1505). Courts have long recognized that a defendant who acts dishonestly to secure an improper benefit for himself or another acts "corruptly." *See United States v. Pasha*, 797 F.3d 1122, 1132 (D.C. Cir. 2015); *United States v. Dorri*, 15 F.3d 888, 890 (9th Cir. 1994); *see also Aguilar*, 515 U.S. at 616 (Scalia, J., concurring in part and

dissenting in part) (characterizing this definition as "a longstanding and well-accepted meaning" of "corruptly"); *Marinello v. United States*, 138 S. Ct. 1101, 1114 (2018) (Thomas, J., dissenting) (stating, in context of the tax obstruction statute, that "'corruptly' requires proof that the defendant not only knew he was obtaining an 'unlawful benefit' but that his 'objective' or 'purpose' was to obtain that unlawful benefit"). But it does not follow that obtaining an improper benefit is the *only* way one may act "corruptly" within the meaning of Section 1512(c)(2).

## II.    The district court did not plainly err by applying sentencing enhancements under Section 2J1.2.

Robertson contends (Br.22-29) that the district court erroneously applied to his Section 1512(c)(2) conviction two sentencing enhancements under U.S.S.G. § 2J1.2 for an offense that "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," § 2J1.2(b)(1)(B), or that "resulted in substantial interference with the administration of justice," § 2J1.2(b)(2). In the district court, Robertson argued that the enhancements did not apply because the supporting facts were inadequate. *See supra* 16-17. For the first time on appeal, Robertson advances the legal claim—relying almost exclusively on *United States v.*

39

*Seefried*, No. 21-cr-287, --- F. Supp. 3d ---, 2022 WL 16528415 (D.D.C. Oct. 29, 2022) (McFadden, J.)—that the enhancements were inapplicable because the certification of the Electoral College vote did not constitute the "administration of justice." Robertson's failure to press that legal argument below subjects his claim to plain-error review. *See United States v. Hunter*, 809 F.3d 677, 682 (D.C. Cir. 2016). The district court's application of the two enhancements under Section 2J1.2 was not erroneous, let alone plainly so.

**A.    The certification of the Electoral College vote involved the "administration of justice" as defined broadly in the Guidelines.**

Section 2J1.2, entitled "Obstruction of Justice," applies to a variety of obstruction offenses, including all offenses under Section 1512 and eleven other statutes found in Chapter 73 of Title 18. *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A. It provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). It also provides for a three-level increase "[i]f the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2).

40

Section 2J1.2's text, purpose, and commentary all support the conclusion that conduct that obstructs Congress's certification of the Electoral College vote interferes with the "administration of justice" for purposes of the guideline. Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government. Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law"). When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added). And courts have defined "administration of justice" to mean "the performance of acts or duties required by the law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (internal quotation marks omitted), or "the performance of acts required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

41

To be sure, the term "administration of justice" is more commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceeding." *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013) (internal quotation marks omitted); *see In re McConnell*, 370 U.S. 230, 234, 236 (1962) (defining the term in the contempt context as relating to "the performance of judicial duty"); *Aguilar*, 515 U.S. at 599 (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings"). But there are compelling reasons to conclude that "administration of justice" has a broader meaning in Section 2J1.2.

First, Section 2J1.2's context and purpose support the broader reading of "administration of justice" in both (b)(2) and (b)(1)(B). Section 2J1.2 applies to an array of obstruction statutes, including many that do *not* involve the "administration of justice" in the narrow sense (*i.e.*, relating to judicial or quasi-judicial proceedings). *See* U.S.S.G. § 2J1.2 cmt. (listing covered statutes); U.S.S.G. Appendix A (statutory index). In addition to obstruction of an "official proceeding" under 18 U.S.C. § 1512 (which, as explained above, includes a "proceeding before the Congress,"

18 U.S.C. § 1515(a)(1)(B)), the Guideline also applies to concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. § 551; obstructing an investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212. Yet under a narrow interpretation of the guideline, the enhancements under Sections 2J1.2(b)(1)(B) and (b)(2) would not apply to those statutes. That itself is a sufficient reason to reject such a reading. *Cf. United States v. Castleman*, 572 U.S. 157, 167 (2014) (rejecting a reading of 18 U.S.C. § 922(g)(9) that "would have rendered [it] inoperative in many States at the time of its enactment").

Section 2J1.2's background commentary further indicates that the Sentencing Commission intended the enhancements to reach the type of dangerous and violent conduct at issue in this case. The background commentary explains that Section 2J1.2 broadly covers crimes "of

varying seriousness," including offenses that involve intercepting grand jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding," and that the underlying conduct may "range from a mere threat to an act of extreme violence." U.S.S.G. § 2J1.2 cmt. Background. Within that range, the enhancements "reflect the more serious forms of obstruction." *Id.* The Commission thus crafted the enhancements in Section 2J1.2 to cover the most egregious *conduct* that might occur during an obstruction offense, with full knowledge that obstruction-of-justice offenses are not limited solely to interference with judicial proceedings.

Relatedly, limiting subsection (b)(1)(B)'s and (b)(2)'s enhancements to obstruction of judicial proceedings would undermine the purpose of the Guidelines. "A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct." *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018) (internal quotation marks omitted). The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct." *United States v. Booker*, 543 U.S. 220, 246 (2005). The Sentencing Commission quite reasonably determined, for

example, that "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice" is more serious than obstruction not involving such injury or threats and should be punished more severely. U.S.S.G. § 2J1.2(b)(1)(B). And the seriousness of the threatening or injurious conduct does not depend on whether the obstructed proceeding is judicial, legislative, or executive. There is no sound basis for assigning a significantly higher offense level to someone who violently interferes with a court proceeding than someone who violently interferes with a congressional proceeding. As Chief Judge Howell recently explained in another case arising out of the January 6, 2021, attack on the Capitol, "There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense." Sentencing Tr. (ECF No. 70) at 69, *United States v. Rubenacker,* No. 21-cr-193 (D.D.C.).

This is especially true considering that subsections (b)(1)(B) and (b)(2) are not simply two factors among many but are the key sentencing factors in most obstruction cases. The three other enhancements in Section 2J1.2 have limited application. Subsections (b)(1)(A) and (b)(1)(c) apply only to violations of Section 1001 and Section 1505 relating to sex or terrorism offenses. And subsection (b)(3), a comparatively minor two-level increase, applies only where a document was destroyed or altered or the offense was "extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3). Reading the enhancements in subsections (b)(1)(B) and (b)(2) as applying only to judicial or quasi-judicial proceedings would fail to address conduct in a wide variety of obstruction offenses covered by Section 2J1.2. By contrast, reading the term "administration of justice" more broadly eliminates this gap in the guideline.

Second, Section 2J1.2's commentary provides a broad definition of "administration of justice." It defines "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false

46

evidence; or *the unnecessary expenditure of substantial governmental or court resources.*" U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). "The term 'includes' clearly indicates that the subsequent listing of acts warranting this enhancement is not exclusive, and that other acts—if similarly or even more disruptive of the administration of justice—could serve as bases for the section 2J1.2(b)(2) enhancement." *United States v. Amer*, 110 F.3d 873, 885 (2d Cir. 1997). This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that includes congressional resources. *See id.* (applying enhancement where defendant unlawfully abducted his children from the United States; "[a]lthough the abduction did not interfere with an ongoing proceeding, this act prevented proper legal proceedings from occurring by taking matters completely outside the purview of the administration of justice"). Commentary in the guidelines that "interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Because this commentary is consistent with the plain text

47

of the Guideline, which uses the broad term "administration of justice," it is authoritative.

To be sure, the commentary defines only the term "substantial interference with the administration of justice," which serves as the basis for the three-level enhancement in subsection 2J1.2(b)(2) and does not specifically define the term "in order to obstruct the administration of justice," which serves as the basis for the eight-point enhancement in subsection 2J1.2(b)(1)(B). But the relevant term "administration of justice" is identical and should be given the same interpretation in both enhancements. The operative verbs "interfere[]" and "obstruct" carry the same meaning in this context. And the adjective "substantial" in subsection 2J1.2(b) does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of *substantial* governmental . . . resources." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). Thus, the term "in order to obstruct the administration of justice" in U.S.S.G. § 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities. A different conclusion would lead to the incongruous result of giving two different meanings to the term "administration of justice"

within the same guideline. *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."); *United States v. Young*, 811 F.3d 592, 603 (2d Cir. 2016) (same for Guidelines).

That conclusion is also consistent with judicial application of the "administration of justice" enhancements in Section 2J1.2(b)(2) to efforts to obstruct a wide range of proceedings beyond judicial or grand jury proceedings. *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (upholding the application of Section 2J1.2(b)(2) after law enforcement officials expended substantial resources to recover the defendant's children he kidnapped and transported internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying Section 2J1.2(b)(2) after a defendant interfered with OSHA investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-99 (S.D.N.Y. 1998) (applying Section

2J1.2(b)(2) after a defendant withheld subpoenaed documents from a congressional subcommittee).[8]

For these reasons, obstruction of the Electoral College certification vote on January 6 falls comfortably within the meaning of "administration of justice" as used in Section 2J1.2 because it involved Congress's performance of duties required by law.    Specifically, Congress's certification of the Electoral College vote was an official proceeding required by both the Constitution and federal statutes.  *See* U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18.  The district court did not err, let alone plainly err, in enhancing Robertson's sentences based upon subsections (b)(1)(B) and (b)(2).

---

[8] Several district court judges have applied Section 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6, both in cases where the parties agreed to their application and where the application was contested.  *See, e.g.*, *United States v. Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003, (Lamberth, J.); *United States v. Miller*, No. 21-cr-075 (Moss, J.) (uncontested, but independently addressed by the Court); *United States v. Rubenacker*, No. 21-cr-193 (Howell, C.J.) (contested); *United States v. Reffitt*, No. 21-cr-032 (Friedrich, J.) (contested); *United States v. Pruitt,* No. 21-cr-23 (Kelly, J.).

**B.      Robertson's reliance on *United States v. Seefried* is misplaced.**

Robertson relies extensively (Br.23-29) on *Seefried*, 2022 WL 16528415, in which the district court judge in that case concluded that the term "administration of justice" in Section 2J1.2 is limited to "a judicial or related proceeding that determines rights or obligations" and therefore excludes the certification proceeding. *Id.* at *1. The reasoning in *Seefried* is unpersuasive.

*Seefried* first discussed Black's Law Dictionary's definitions of "administration of justice" and "due administration of justice," which, the court there concluded, "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights." *Seefried*, 2022 WL 16528415, at *2. *Seefried* also found that dictionary's definition of "obstructing" and "interfering with" the administration of justice "further corroborates that the 'administration of justice' involves something like a legal proceeding, such as a trial or grand jury hearing." *Id.* at *3. But *Seefried* did not consider the broader definitions of "justice" and "obstruction of justice" discussed above, which relate to the orderly administration of the law more generally. Indeed, Black's Law Dictionary recognizes that

"[c]onduct that defies the authority or dignity of a court *or legislature* . . . interferes with the administration of justice."  Black's Law Dictionary (11th ed. 2019) (emphasis added).

Nor does *Seefried*'s corpus linguistics analysis support a different result.  Surveying a representative sampling of 375 uses of the term "administration of justice" in legal usage between 1977 and 1987 in the Corpus of Caselaw Access Project database, which compiles the text of federal and state court decisions (*see* https://lncl8.lawcorpus.byu.edu/), *Seefried* found that about 65% of the hits referred to "a judicial proceeding deciding legal rights," about 4% involved "law enforcement activities," and only three entries "referr[ed] to government function generally."  *Seefried*, 2022 WL 16528415, at *6-*7.  But the simple fact that "obstruction of justice" *usually* occurs in a judicial context does not mean that it *must*, particularly where, as here, the guideline's context, purpose, and commentary point in a different direction and where, as here, the January 6 attack on Congress to prevent the Electoral Certification has no historical analogue.  Like all words, legal terms often bear multiple meanings.  For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the

prosecution's withholding of favorable evidence from the defense. Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus. And in this case, the frequent use of other meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and corresponds with the commentary's definition.

*Seefried* was also incorrect in its analysis of Section 2J1.2's commentary. *See Seefried*, 2022 WL 16528415, at *7-*9. As an initial matter, *Seefried* questioned whether the commentary was even "authoritative," pointing out that this Court "has suggested that courts should eschew deference to the Commission when the commentary expands the meaning of the text of the Guidelines themselves." *Id.* at *7-*8 (citing *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018)). But *Winstead* involved a very different situation, in which the guideline's text included a specific list of crimes defined as "controlled substance offenses" and the commentary added an additional *attempt* crime that was "not included in the guideline." *Winstead*, 890 F.3d at 1090. This Court held that "[b]y purporting to add attempted offenses to the clear textual definition," rather than "interpret[ing] or explain[ing]

the ones already there," the commentary conflicted with the guideline and was not authoritative under *Stinson*. *Id.* at 1091. Here, by contrast, the commentary does not attempt to add to a finite list of offenses, but rather "explain[s]" that the term "administration of justice" bears a broad meaning that includes non-judicial proceedings.

Nor was *Seefried* correct that Section 2J1.2's commentary—even if it were binding—supports only "a narrower interpretation of the 'administration of justice.'" *Seefried*, 2022 WL 16528415, at \*8. Although the commentary's definition "includes" things such as "investigations, verdicts, and judicial determinations," that fact does not mean that the definition excludes congressional proceedings. The commentary's use of the word "includes" indicates that the definition is not an exhaustive list. *See* Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012); *see also Amer*, 110 F.3d at 885. And other parts of the definition go well beyond judicial proceedings: "premature or improper termination of a felony investigation" includes executive-branch investigations that are not yet before a grand jury or court, and "the unnecessary expenditure of substantial governmental or court resources" includes governmental resources of all types.

54

Reading the commentary's use of the term "'Governmental . . . resources'" to include congressional resources would not, as *Seefried* concluded, "render[ ] the phrase 'or court' superfluous." *Seefried*, 2022 WL 16528415, at *9. Although a "broad definition" of "'Governmental'" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is hardly an obvious superfluity. The Sentencing Commission could have added the word "court" to clarify that the term "'Governmental'" did not exclude courts. And the purported superfluity could be avoided by reading "'Governmental . . . resources'" to refer to the resources of both the executive and legislative branches (as opposed to the judicial). The superfluity canon provides no basis to limit the term to "*prosecutorial* resources." *Id.* Moreover, *Seefried*'s interpretation of the commentary runs into its own superfluity problem. If, as *Seefried* concluded, the term "administration of justice" in Section 2J1.2 refers only to "a judicial or related proceeding," *id.* at *1, then the word "governmental" is itself superfluous.

*Seefried*'s concern that a broader reading of "administration of justice" would allow the government to "trigger the enhancements at

55

will" is also misplaced. *Seefried*, 2022 WL 16528415, at *8. The enhancements in Section 2J1.2 do not apply whenever the offense "caused unnecessary expenditure of [government] resources" in some attenuated way, such as by causing the government to later bring a prosecution. *Id.* ("While the events of January 6 caused the Government to commit significant resources—evidenced in part by the number of cases charged in this district—this argument proves too much."). Instead, the enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources. *See United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996) (observing that the case resulted in the expenditure of "substantial resources . . . over and above the routine costs of prosecuting the obstruction offense"). If the enhancement could truly be triggered simply by "charg[ing]" a case, *Seefried*, 2022 WL 16528415, at *8, then even under *Seefried*'s reading the enhancement would apply every time the government brought a felony prosecution, which results in the expenditure of substantial "court" and "prosecutorial" resources. *Seefried*'s conclusion that "governmental" should be read to exclude

Congress simply does not follow from its concerns about excessive application of the enhancements.

*Seefried* was also incorrect in perceiving a conflict between the government's interpretation of "administration of justice" in Section 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catchall provision prohibiting obstruction of "the due administration of justice." *See Seefried*, 2022 WL 16528415, at *3 (observing that the government had not charged any January 6 defendants under Section 1503); *id.* at *10-*11 (saying it would be "incongruous" to conclude that "official proceeding" means something different in the Sentencing Guidelines than in the statutory context). The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011). And there are at least three differences between Section 1503 and Section 2J1.2 that counsel in favor of reading them differently. First, unlike Section 1503, Section 2J1.2 includes its own definition of the "administration of justice," which covers the expenditure of "governmental *or* court" resources. Second, Section 1503 appears in the context of a statute that applies to jurors, court officers, and judges,

57

which may favor a narrower reading of the catchall provision for interference with the "due administration of justice." And third, Section 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

*Seefried*'s reading of Section 2J1.2 also creates difficult line-drawing problems. Under its reasoning, the enhancements in subsection (b)(1)(B) and (b)(2) apply only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature. *Seefried*, 2022 WL 16528415, at *2. But those terms themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations." *Id.* at *1. For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress. That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id.* at *1-*2, yet it does not involve the "possibility of punishment by the state," *id.* at *2. A broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered

58

by Section 2J1.2.  Under that reading, a sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

In any event, even under a narrower reading of administration of justice, the Electoral College certification fits within the definition because it has quasi-judicial features.  The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election.  3 U.S.C. § 15.  As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection.  *Id.*  Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared."  3 U.S.C. § 16.  Indeed, for these reasons, several judges—including the district court in this case—have concluded that Congress's certification of the Electoral College is a "quasi-adjudicative or quasi-judicial" proceeding.  *United States v. Nordean*, 579 F. Supp. 3d 28, 43 (D.D.C. 2021); *see United States v. Robertson*, 588 F. Supp. 3d 114,

121-22 (D.D.C. 2022) (concluding that "the certification of the Electoral College vote is quasi-adjudicatory"); *United States v. Caldwell*, 581 F. Supp. 3d 1, 14-15 (D.D.C. 2021) (concluding that the certification was "an 'adjudicatory' proceeding").

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the district court.

Respectfully submitted,

MATTHEW M. GRAVES
    United States Attorney
    District of Columbia

DENISE CHEUNG
CHRISELLEN KOLB
    Assistant U.S. Attorneys

KENNETH A. POLITE
    Assistant Attorney General

LISA H. MILLER
    Deputy    Assistant    Attorney
    General

/S/ JAMES I. PEARCE
    Special Assistant U.S. Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 532-4991
    James.Pearce@usdoj.gov

February 6, 2023

60

# CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d), the undersigned counsel of record certifies that the foregoing Brief for the United States was this day served upon counsel for appellant, by notice of electronic filing with the District of Columbia Circuit CM/ECF system.

DATED: FEBRUARY 6, 2023

s/ James I. Pearce
JAMES I. PEARCE
Special Assistant U.S. Attorney,
601 D Street, NW
Washington, DC 20530
(202) 532-4991
James.Pearce@usdoj.gov

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 11,691 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Century 14-point font in text and Century 14-point font in footnotes.

3. This brief complies with the privacy redaction requirement of Fed R. App. 25(a)(5) because it contains no personal data identifiers.

4. The digital version electronically filed with the Court on this day is an exact copy of the written document to be sent to the Clerk; and

5. This brief has been scanned for viruses with the most recent version of McAfee Endpoint Security, version 10.7, which is continuously updated, and according to that program is free of viruses.

DATED: FEBRUARY 6, 2023

s/ James I. Pearce
JAMES I. PEARCE